**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

ALESIA D. BUSBY,                              :

      Plaintiff,                      :

vs.                                          :        CA 13-0120-C

CAROLYN W. COLVIN,                           :
Acting Commissioner of Social Security,
                                             :
      Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. § 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 19 & 20 ("In accordance with provisions of 28 U.S.C. §636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.").) Upon consideration of the administrative record, plaintiff's brief, the Commissioner's brief, and the arguments of the parties at the November 21, 2013 hearing before the Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

---

[1]      Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 19 & 20 ("An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

Plaintiff alleges disability due to degenerative joint disease of the knee, degenerative disc disease of the lumbar spine, major depressive disorder, and anxiety. The Administrative Law Judge (ALJ) made the following relevant findings:

**1.    The claimant has not engaged in substantial gainful activity since October 8, 2010, the application date (20 CFR 416.971 *et seq*.).**

**2.    The claimant has the following severe impairments: degenerative joint disease of the knee, degenerative disc disease of [the] lumbar spine, major depressive disorder and anxiety (20 CFR 416.920(c)).**

.    .    .

**3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

.    .    .

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction. . . . The claimant alleges a severely limited daily routine, and indicates her sister generally cares for her. However, her allegations that she is unable to watch television and has severe issues attending to personal care are contradicted by her statements of activities of daily living made to the consultative examiner in January 2011. The objective medical evidence fails to support that the claimant's mental capacity to perform these basic daily activities are limited to the extent alleged. In January 2011, the claimant reported that she watches television, eats, and sleeps. She performs light household chores such as dusting, but her sister fixes her food. While she reported that she doesn't like getting out of the house, by the claimant's own report in her function report, she does so when needed. The claimant generally attributes her incapacity to perform tasks

within the household on her physical condition. However, the severity of her physical dysfunction alleged remained unsupported by the objective medical evidence, without evidence supporting the medical need for daily use of a knee brace, or periodic use of an assistive device in ambulation. The claimant alleges severe deficits in her daily activities. However, the evidence fails to support the claimant's limited daily activities are caused by her mental incapacity to perform these tasks.

In social functioning, the claimant has moderate difficulties. The claimant alleges in her disability report that she suffers from severe problems due to her mood disorder. She submitted a function report in December 2010 alleging that she has no significant social activities and even states that she does not go to the doctor. She reports her condition affects her ability to get along with others and her ability to talk. She reported that she stays to herself and that she has problems getting along with family, friends, and neighbors because she has outbursts. She reported she could get along with authority figures okay at times, but this was before her bipolar condition started, although the objective evidence does not support she suffers from bipolar disorder. She also reports that she has phobias about going outside and being around people, and stays to herself. However, she also reported that her family members care for her and her sister takes her where she needs to go, indicating that she remains able to interact with family effectively, and travels outside the house when needed despite her allegations to the contrary. . . . Two treating sources have assessed marked deficits in social functioning. However, these treating source assessments remain unsupported by objective clinical findings or observations. They are also contradicted by findings provided in treatment records. Treatment records found that between November 2010 and June 2012, the claimant demonstrated no limitations in speech or the ability to communicate. Furthermore, the claimant's mood fluctuated from mild sadness or depression, to irritable and appropriate to the situation. Her behavior was normal, and has not been engaging in self-injurious behavior during the relevant period. Despite the claimant's history of a suicide attempt, the claimant's allegations of hallucinations provided to the consultative examiner are unsupported in any mental health treatment records prior to the examination or after the examination. The clinical findings provided in treatment records support no more than moderate symptoms and limitations in her capacity to interact with others with ongoing treatment.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant alleges that she suffers from severe problems attending to her daily routine, including limited maintenance of personal hygiene or care. She also remains unable to perform any meal preparation, household chores, or use public transportation, with her sister transporting her to her appointments or shopping when necessary. She alleges being unable to handle money, and reports she gets confused. She reports her interests include watching television, but that she is not at all able to do this anymore. She alleges her condition affects her ability to

complete tasks, follow instructions, understand, and complete tasks. She reported issues with memory and that she suffers from outbursts. She notes being unable to pay attention for any significant period and that she has problems getting her mind to work. Her treating physician and psychiatrist assessed the claimant's functioning in this area have marked to extreme limitations in functioning. However, these assessments are afforded no significant weight, as they are contradicted by the corresponding mental health treatment records. The claimant's treatment records have continued to find no significant impairment in her memory or concentration, and no significant impairment in her capacity to communicate effectively. The claimant's treatment records reveal progressive improvement and stability with treatment, in spite of the claimant's ongoing allegations of a debilitating condition. The full record continues to support no more than moderate deficits in this area during the relevant period, further supported by ongoing treatment records and the State agency psychological assessment.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation[] which have been of extended duration. The claimant's mental health treatment has remained limited to visits for medication management. While the claimant reports she was admitted for treatment following a suicide attempt, this episode was brief and not of extended duration, and was stated to have occurred remote to the relevant period. The claimant's mental health treatment records reflect that with treatment her symptoms have progressively improved with minimal issues with the prescribed treatment. The claimant has reported some side effects of sleepiness, but has not requested significant changes to treatment. The claimant does not attend regular therapy sessions despite numerous recommendations to do so, although she does attend periodic medication management visits. Treatment notes on March 22, 2012 continued to encourage the claimant to see a therapist. She has not exhausted the treatment options available, and the prescribed course of treatment remains limited. The claimant's condition has not required further admissions for mental health treatment or hospitalizations, or the need for changes in treatment of a degree that would support decompensation. The objective medical evidence fails to support the claimant's condition has resulted in episodes of decompensation of extended duration.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

.        .        .

**4.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of  light work as defined in 20 CFR 416.967(b). The claimant**

**can lift and carry 20 pounds occasionally and 10 pounds frequently. The claimant has no restriction in the ability to sit, and standing/walking would be limited to 30 minutes at a time but could be done throughout the workday as long as there was a change in position every 30 minutes. The claimant can [do] no more than occasionally operate foot controls or climb ramps or stairs, but never climb ladders, ropes or scaffolds. The claimant can never crawl or kneel, and [is] unable to work around unprotected heights or dangerous equipment. The claimant must avoid tasks that involve a variety of instructions or tasks, but is able to understand and carry out simple one and two step instructions and detailed but uninvolved written or oral instructions involving a few concrete variables in or from standardized situations. The claimant must have minimal changes in the work setting and routines. The claimant must only be expected to make judgments on simple work related decisions. The claimant must avoid production-paced work such as work that is being pushed at them, but is able to perform goal-oriented work. The claimant must avoid crowds and can have no more than occasional and superficial contact with the public.**

.    .    .

The claimant reinitiated treatment from the Mostellar Medical Center in July 2007. The claimant had not been seen for treatment there for three years, and noted she had been under the care of another doctor. In January 2011, the claimant underwent a consultative medical examination performed by Elmo Ozment, M.D. The claimant reported periodic issues with her back, beginning in 1997, but noted she has had no x-rays and had sought no treatment for such a condition for years. Prior medical treatment records between 2007 and 2010 reflected no significant treatment sought or received for problems relating to the claimant's back complaints. She report[ed] to Dr. Ozment] issues with her lower back as well as problems with her left knee, including a history of arthroscopic surgery performed on the left knee. The claimant reported that her orthopedic pain [wa]s an estimated 10 on a 10-point scale, and that nothing help[ed] the pain. As a result, she [reported being] unable to perform work activity and can perform very little housework because it hurts her back and left knee. . . . Despite the claimant's orthopedic pain and obesity, the claimant has not demonstrated the level of physical dysfunction consistent with her allegations. She was observed to sit comfortably and was able to get on and off the examination table without difficulty. Her gait was normal. She could not squat and [was] unable to heel-to-toe walk due to her back and knees, but could tandem walk. She did not have an assistive device during the examination or a brace during the examination, despite her [hearing] testimony that she uses the brace daily and a cane when needed. There was limited range of motion of the lumbar spine and left knee. Seated leg raise revealed pain in the knee and a positive straight leg raise in both sides of the back. There was some paravertebral muscle spasms and tenderness. However, there was no deformity or crepitus. Her motor strength remained full. Her bulk and

tone remained normal in her extremities. The clinical findings and observations made by Dr. Ozment support the [finding that] the claimant continues to suffer from orthopedic dysfunction. However, the evidence does not support the debilitating condition alleged, and supports the [finding that] claimant would be capable of functioning with physical restrictions.

Ongoing medical treatment records continue to support the ongoing need for medical treatment, but also provide clinical findings and objective evidence that remain inconsistent with the severity of the claimant's allegations. The claimant sought treatment in April 2011, from the Mostellar Medical Center. She was found to be in no apparent distress. She had mild muscle spasm of the lumbar spine, with full range of motion of the back with mild pain. There was also mild pain with straight leg raising testing bilaterally. However, there was no pain with flexion or lateral rotation of the knee. The lumbar x-rays showed mild degenerative changes throughout the lumbar spine, but do not reflect the debilitating condition alleged. The claimant sought treatment for left leg pain later the same month, reporting it was painful to stand and [complaining of] tingling in the left hand. However, venous Doppler imaging was negative. Further radiological imaging taken in August 2011 showed evidence of left knee osteoarthritis, but no evidence of acute fracture or dislocation of the left knee. On examination, the claimant's gait was antalgic and there was no swelling. She had some pain of the left knee and back. Physical therapy was prescribed along with anti-inflammatories and muscle relaxers. However, the testing results and nature of treatment prescribed does not reflect the type of treatment that is consistent with a debilitating orthopedic condition.

Treatment in November 2011 was sought for a sore throat and earache, minor and temporary ailments that have not persisted. However, this record does not reflect any significant orthopedic complaints. The claimant sought treatment for hemorrhoids in January 2012. However, there were no significant changes [] made in her medical treatment. She received gynecological treatment in May of 2012. Orthopedic findings remain[ed] mild. Radiological imaging taken in April 2012 continued to find only mild degenerative changes of the lumbosacral spine. As of June 2012, the claimant was seeking treatment for abdominal pain and there were no records of complaints [regarding] orthopedic dysfunction. The objective evidence provides evidence that while her back and knee may cause limitations in functioning, they are not debilitating. Restrictions in the claimant's exertional capacity have been afforded, with particular restrictions in standing and walking in order to accommodate the combination of back and knee orthopedic issues, in combination with obesity. Restrictions in postural function were similarly provided, also contributing to restriction in working around dangerous equipment or unprotected heights. Despite her allegations of the daily need for a knee brace and occasional need to use a cane, she acknowledged at the hearing that these assistive devices were not prescribed. Furthermore, the

evidence does not support the claimant's allegations regarding the persistent use of these devices, as they were not observed by treating sources to have been used with any regularity or the frequency alleged, even in orthopedic treatment in August 2011. The restrictions provided accommodate the claimant's physical capacity to function as supported by clinical findings and observations made of her medical condition, as reflected in treatment and examination records.

An assessment of the claimant's physical capacity to function and clinical assessment of pain were submitted by the claimant's treating medical source, Eugene Fletcher, D.O. The claimant was assessed as capable of performing the exertional requirements between the light and sedentary exertional levels. Additional restrictions were assessed in postural and environmental functioning. These functional restrictions were attributed to the claimant's major depressive disorder and recurrent moderate generalized anxiety disorder. However, the mental impairments cited in support by Dr. Fletcher do[] not support the physical restrictions in functioning assessed. The degree of pain was assessed to distract from adequate performance of work activities and that medication side effect[s] can be expected to be severe and limit her effectiveness. However, Dr. Fletcher also noted that the claimant was not seen for pain management. The degree of pain assessed is inconsistent with the limited nature of treatment prescribed, which at that time included anti-inflammatories, muscle relaxers, and limited pain medications. The claimant was not being prescribed the nature of pain medication[s] that would be consistent with the level of pain assessed. There are significant inconsistencies between the assessment provided by Dr. Fletcher and the clinical findings provided in corresponding treatment records. Dr. Fletcher has provided assessments of the claimant's physical incapacity to function, based on diagnosed mental impairments. This is outside Dr. Fletcher's treating medical relationship, and the clinical findings of record fail to support the exertional, postural, or environmental restrictions noted. The degree of pain assessed was accompanied by notes the claimant was not receiving pain management [treatment] with Dr. Fletcher, and the claimant's limited ongoing treatment history is inconsistent with the debilitating condition alleged. Therefore, Dr. Fletcher's assessment of the claimant's physical capacity and pain are inconsistent with the full record and [are] afforded little weight.

In addition to the claimant's physical limitations in functioning, the evidence also supports the [finding that the] claimant suffers from mental impairments restricting her capacity to function. In February 2009, the claimant was noted to be in the hospital following an attempted suicide, but her admission for treatment was brief. Her prescribed mental health treatment was noted to be limited, as the claimant had cancelled her first therapy session that was scheduled on referral. Subsequent records in March 2012 continued to encourage that she see a therapist, and indicates she had not undergone any sustained therapy treatment. As of January 2010, she reported complaints of depression and not feeling well. She was

assessed with anxiety and depression, and again referred [for] mental health treatment. Treatment records from Altapointe Health Systems note that the claimant was hospitalized in January 2009 for overdosing on pain medications belonging to her sister. The claimant report[ed] that she has problems getting along with others, and she quits jobs because she does not want to be around others. She report[ed] crying, overeating, and sleeping most of the day, as noted in September 2010. Despite her issues with mood, the claimant's mental status remains inconsistent with her allegations of cognitive dysfunction. Her intellect was estimated to be average at that time, and her memory and concentration were unimpaired. The claimant's mental health treatment leading up to the application for benefits is limited, and has not demonstrated the severity of functional limitations alleged.

The claimant complained of low energy and poor concentration in November 2010, and reported that her mood was improved but [she] still has mood swings. While these treatment records from Altapointe Health Systems initially noted her complaints of poor concentration, low energy, panic attacks, and sleeping through most of the day, she reported no issues with the medications prescribed or side effects, and expressed her desire to continue with the medications prescribed. Examination note[s] [reflect] there was no impairment in memory or concentration noted, and the thoughts were logical, coherent, and within normal limits. As of January 2011, the claimant reported no side effects to the medications prescribed for treatment of her depression and anxiety. She reported that her depression has been improving, though she still feels depressed. The mental status examination noted she was sad and suffers from mood swings, but found her behavior to be normal. There was no impairment in speech, despite the claimant's allegations in her function report that her ability to talk is affected. Her memory and concentration remained unimpaired, and thoughts remain within normal limits. Treatment in February 2011 noted limited improvement on the medications provided, but her mental status remained relatively unchanged. Her mood was normal but mildly depressed, her behavior was normal, and despite her excessive sleep and appetite, her memory and concentration remain[ed] unimpaired, with insight and judgment that is good and only mild anxiety. She reported not having taken some of her medications in a subsequent treatment record, due to financial circumstance[s]. However, she also reported that she continues to take the Prozac without side effect, and that her mood has been improving. She noted feeling tired and having poor concentration, despite the clinical findings and no significant changes were made in her prescribed treatment. Records of mental health treatment in the months following the application date show improvement in the claimant's mental condition. Despite continued complaints regarding depression and anxiety, she continue[d] to report no significant side effects to medications, despite her allegations made at the hearing. The evidence supports [that] her mental health treatment is necessary, and has significantly improved the claimant's condition.

The claimant underwent a consultative psychological examination performed by Annie Formwalt, Psy.D., in January 2011. The claimant reported that she is unable to work due to borderline personality [disorder] and bipolar [disorder], as well as a bad back. She reported having been diagnosed with these impairments. While records in November 2010 do include assessments of borderline personality [disorder] and depression, the claimant was not diagnosed with bipolar disorder, and subsequent treatment records do not support a corroborating diagnosis of borderline personality. In addition to ongoing complaints of mood swings and a history of taking her sister's pain p[i]lls, she also reported audio and visual hallucinations of a demon-like creature, but explained that she has not mentioned her hallucinations to her treating psychiatrist despite having received persistent mental health treatment since January 2009. She reports that she has left prior jobs because she has issues being around other people. Her daily activities include watching television, eating, and sleeping, as well as dusting, although the claimant alleged in her function report she is unable to watch television. She was assessed with a mood disorder [by Dr. Formwalt], but was expected to respond favorably to treatment. Her thought processes were intact, and she did not appear to be confused. Her insight and understanding were fair, and intelligence estimated to be low average to borderline. The consultative examination reveals that mental health treatment continues to be warranted. However, the claimant's mental status and reports to the consultative examiner remains inconsistent with the claimant's treatment records and evidence of continued improvement with treatment, further supported by Dr. Formwalt's prognosis. Her mental status during the examination was limited, but well above the debilitating condition alleged. She reported a number of symptoms that are unsupported by clinical findings in treatment records . . . . Despite reporting having visual and audio hallucinations of approximately thirty-eight years to the consultative examiner, the claimant has failed to report any such concerns to any treating mental health sources in previous treatment visits from January 2009 through the 2011 examination. The clinical findings and the claimant's treatment history remain inconsistent with the nature and severity of her allegations. The claimant's reports of hallucinations and her incapacity to perform even basic tasks are inconsistent with records of treatment during the corresponding period. The objective findings support [the determination that] she retains a substantially higher level of functioning than alleged.

During March 2011 mental health treatment, the claimant reported that she suffers from frequent panic attacks for the past six years, estimating suffering from three to four panic attacks a day, lasting about thirty minutes each. However, this is inconsistent with her allegations made in prior treatment records, which fail to reflect such severe and frequent panic attacks. She also reported worsening depression[] over the past four to five years. She reports that she is unable to sustain work because she has panic attacks and poor concentration. However, on examination[,] she was found to be [only] mildly depressed, with an affect appropriate to the

situation. There was no impairment in speech, and no impairment was found in her memory or concentration. She had been taking the medications as prescribed, without side effect and with good result, as noted by Shao Hua Ye, M.D. She reported her mood was improving. Dr. Ye assessed she has a global assessment of functioning (GAF) score of 51-60, consistent with moderate symptoms and limitations. Her mood continued to be depressed but improved, with no impairment in memory or concentration despite her allegations. The claimant continued to report no side effects to her current medications, despite testimony that her medication side effects are severe and contribute to her sleeping through most of the day. The claimant continued to report compliance [with] the prescribed treatment, no significant side effects, and fair results from the medications provided, and mildly depressed, with unimpaired memory and concentration, in subsequent May, June, August, and September 2011 treatment visits. As of October 2011, the claimant continued to report depressive symptoms. Examination noted mild sadness, but no impairment in speech, normal behavior, with unimpaired memory and concentration and no anxiety indicated. Her insight and judgment were fair and perceptions were within normal limits. Records as of January 2012 noted that she has been compliant with treatment, as her sister continues to control the distribution of medications, with some improvement in her depressive and anxiety symptoms, without significant side effects. No significant adjustments in treatment were warranted, and the claimant's mental health treatment continues to demonstrate that sustained compliance continues to result in progressive improvement in the claimant's condition.

The claimant's most recent records of treatment continue to support significant improvement in the claimant's impairments with the treatment provided. The claimant reported in March 2012 that she was doing okay. She revealed that medications continue to be administered by her sister, and that she sleeps a lot. She reports compliance with the current medications and some improvement in her depressive symptoms and anxiety without side effects other than some sleepiness. However, there were no significant efforts to adjust her treatment. Her mood was found to be normal and anxiety was mild, with no impairment in speech. Her behavior was normal, and her perception was within normal limits. Her memory and concentration remained unimpaired. Similar findings are noted in treatment [records] between March and June 2012. She continued to report she is depressive at times, but stable emotionally with the medicines. She also denies adverse medication effects in June 2012. The claimant's ongoing treatment records reveal that ongoing mental health treatment is warranted, as supported by records from Altapointe Health Systems. However, these records continue to demonstrate that the claimant's condition has improved significantly and remain[s] stable with the treatment prescribed. There is evidence of some medication side effects of sleepiness, but no significant efforts or requests made to seek an alternative medication. The claimant's mental condition continued to reflect generally mild or normal findings, especially in the areas of mood,

behavior, speech, memory, concentration, judgment and insight. The objective medical evidence does support that the claimant's slight medication side effects would merit restriction in working around work hazards. The residual symptoms of her depression and anxiety are provided [with] restrictions in social functioning and concentration, persistence or pace. While she generally demonstrates mild symptoms in these areas, moderate limitations are afforded in order to accommodate fluctuations in her condition.

Treating source Dr. Ye submitted an assessment of her mental capacity to function in March 2011. The claimant was assessed with marked limitations in activities of daily living, social functioning, and concentration, persistence or pace, with four or more episodes of decompensation. However, the evidence fails to support the severity of functional limitations alleged. Dr. Ye failed to provide any assessment regarding the duration in which such marked deficits began. Furthermore, Dr. Ye noted that the claimant suffers from side effects of sedation due to the medications. However, this is contradicted by corresponding findings from Dr. Ye's own office notes that continued to find there were no medication side effects, as noted in treatment records from November 2010 through September 2011. The assessment of marked deficits in functioning is inconsistent with treatment notes, including findings that the claimant was mildly depressed, and that her concentration and attention are unimpaired. The GAF score assessed in March 2011 further support[s] only moderate symptoms or limitations, contradicting Dr. Ye's March 2011 assessment. The record supports a history of a brief hospitalization reported to be remote to the relevant period, due to a suicide attempt. However, the evidence does not support [that] this was of extended duration, and the full record fails to document Dr. Ye's assessment of four or more episodes of decompensation. The claimant's mental health treatment during the relevant period has remained limited to periodic medication management, inconsistent with periods of decompensation. Clinical findings have remained consistent, and mild in nature. Dr. Ye's assessment is considered as psychiatric treating source opinion evidence. However, this assessment is inconsistent with the clinical findings and objective evidence provided in treatment records, inconsistent with Dr. Ye's own office notes, as well as failing to determine the duration for which such limitations were assessed. Based on the lack of objective support and inconsistencies with corresponding treatment records, Dr. Ye's assessment is afforded little weight.

An assessment of the claimant's mental capacity to function was submitted by treating medical source Dr. Fletcher. Dr. Fletcher assessed the claimant suffers from moderate restrictions in activities of daily living, marked limitations in social functioning, and extreme deficits in concentration, persistence or pace, with four or more episodes of decompensation. The claimant was assessed with marked and extreme limitations in performing tasks in the work setting. Dr. Fletcher also found that her mental impairments have affected her since childhood, but

worsened over the past five years. Despite alleging marked and extreme limitations in functioning, Dr. Fletcher also noted that the claimant's condition was expected to improve with treatment. Dr. Fletcher's assessment of marked and extreme limitations in mental functioning is afforded no significant weight. Corresponding mental health treatment records regularly noted the claimant to have logical thoughts and unimpaired concentration, from November 2010 through January 2012. The claimant's mental condition has been determined to warrant ongoing mental health treatment, but not of the degree consistent with Dr. Fletcher's assessment. The full record fails to support this assessment of her mental capacity . . . and this assessment was afforded no significant weight based on the inconsistencies with the objective treatment records.

An assessment of the claimant's mental capacity to function was performed by State agency psychological consultant Donald Hinton, Ph.D., [o]n January 20, 2011. The claimant was assessed[] to suffer from mild restriction in activities of daily living, moderate difficulty in maintaining social functioning and concentration, persistence or pace, with no episodes of decompensation. The claimant's records of treatment were evaluated in light of her continued level of activities. The evidence cited supports the degree of functional limitations alleged. While there is additional evidence made available at the hearing level, the degrees of functional limitations assessed by Dr. Hinton continues to be supported by the additional evidence. Dr. Hinton's opinion evidence was afforded significant weight, but with deference afforded to the additional evidence made available at the hearing level. Based on the combination of Dr. Fletcher's assessment and additional treatment, the claimant was afforded significant restrictions in the complexity of tasks and instructions, changes in the workplace, the pace of work performed, and exposure to crowds and the public. Therefore, moderate restrictions were provided in these areas in order to accommodate the claimant's condition.

. . . The claimant has a long history of treatment, and ongoing records support she continues to require ongoing medical and mental health treatment. Despite the frequency and persistence of her treatment, the clinical and diagnostic findings still do not support the severity of the claimant's allegations. The evidence reveals that despite initial concerns regarding her access to treatment, she has generally had treatment through the relevant period. The claimant has reported problems obtaining and taking all of the medications prescribed, due to financial circumstance[s], as noted in February 2011 mental health treatment records. However, medical treatment records in March 2009 reported efforts to get the claimant on a prescription assistance program, indicating the claimant would have notice that such options are available to alleviate costs of her treatment. Furthermore, records in June 2012 include evidence that the claimant has Medicaid coverage, which indicate she has access to continued treatment. Despite generally having access to treatment, the claimant's prescribed treatment has remained unchanged. There are no records of significant adjustments in treatment or an aggressive course of

care. The claimant's mental impairments are addressed with medication management, with clinical findings showing mild symptoms through the relevant period. She has not received a significant record of therapy despite ongoing encouragement to do so from her treating psychiatrist, as noted on March 22, 2012. Despite repeated allegations that her concentration is insufficient to perform work activity, the claimant's concentration continues to be found [] unimpaired. She has alleged frequent anxiety and panic attacks, numerous times daily. However, this remains unsupported by treatment records which found her anxiety to be no more than mild. Despite the claimant's allegations, her longitudinal treatment history illustrates a mental condition that generally remains mildly limited, but even accommodating fluctuations and exacerbations, has not been more than moderately limited during the relevant period.

The claimant has provided conflicting accounts regarding the nature and severity of her various symptoms and limitations in functioning. In the January 2011 examination report, she initially stated that five years ago she began hearing voices in her head. However, she then reported following a command hallucination two years earlier, resulting in taking her sister's pain pills. The claimant then reported that she also sees small demon[-]like creatures that she has seen since age ten, which according to her date of birth, was a period of approximately thirty-eight years. Despite the length of visual hallucinations, the claimant then reported that she has not reported these hallucinations to her treating psychiatrist, Dr. Ye. However, this is inconsistent with the severity and long history of these allegations. She alleges severe and persistent hallucinations during the consultative examination, but does not report any such concerns to any medical or psychological sources for purposes of treatment. The consultative examiner noted that the claimant's statements are questionable. The claimant states that she suffers from severe issues with hallucinations when she is reporting to the consultative examiner for purposes of seeking disability. However, she acknowledges she has failed to raise these issues with her treating psychiatric source and as a result has not requested any treatment for such symptoms, despite the alleged severity these hallucinations have on her mental health. She also failed to raise any significant concerns with hallucinations in subsequent treatment visits after the consultative examination. The claimant failed to raise these issues with treating sources despite the duration of these problems, alleging that she suffers from significant hallucinations for nearly four decades. The claimant's allegations are not only unsupported by the evidence, but her numerous inconsistent statements further limit the credibility of her allegations regarding the nature and severity of her functional restrictions.

The claimant's statements that there are a number of impairments which influence the claimant's capacity to function are generally credible. However, allegations regarding the nature and extent of the claimant's functional limitations remain inconsistent with the objective medical records and other evidence. In light of the full record, the claimant's

allegations regarding the severity of limitations are found to be no more than partially credible.

In sum, the above residual functional capacity assessment is supported by the objective medical evidence including radiological imaging, laboratory testing results, diagnostic and clinical findings, and other evidence provided in treatment and examination records. The above residual functional capacity assessment is also supported by medical and psychological opinion evidence, without contradictory treating medical source opinion evidence that is supported by the objective medical evidence. Additional factors supporting the residual functional capacity assessment include the claimant's longitudinal treatment history and inconsistent statements.

**5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).**

.      .      .

**6.      The claimant was born on September 16, 1962 and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.953).**

**7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).**

**8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).**

.      .      .

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.18 and Rule 202.11. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and

residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as follows: . . . Tube Operator[, DOT Code] 239.687-014[,] 100,000 US[/]1,200 AL[,] . . . Sedentary[, and] [u]nskilled[;] Traffic Checker[, DOT Code] 205.367-058[,] 200,000 US[/]3,700 AL[,] . . . Light[, and] [u]nskilled[; and] Caller[, DOT Code] 215.563-010[,] 100,000 US[/] 800 AL[,] . . . Light[, and] [u]nskilled[.]

Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. The vocational expert testified credibly regarding slightly limited standing and walking. The explanation provided was based upon the observations of the work activity performed, and was found to be persuasive in resolving any likely discrepancies. The vocational expert testimony was found to be persuasive.

Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules.

**10. The claimant has not been under a disability, as defined in the Social Security Act, since October 8, 2010, the date the application was filed (20 CFR 416.920(g)).**

(Tr. 21, 22, 22-23, 23, 23-24, 24, 24-25, 25, 27, 27-30, 30-33, 33-34, 35 & 35-36 (internal citations omitted; emphasis in original).) The Appeals Council affirmed the ALJ's decision (Tr. 1-3) and thus, the hearing decision became the final decision of the Commissioner of Social Security.

## DISCUSSION

In all Social Security cases, the claimant bears the burden of proving that she is unable to perform her previous work. *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. *Id.* at 1005. Once the claimant meets this burden, it becomes the

Commissioner's burden to prove that the claimant is capable, given her age, education and work history, of engaging in another kind of substantial gainful employment, which exists in the national economy. *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she can perform those light and sedentary jobs identified by the vocational expert, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[2]

In this case, the plaintiff contends that the following errors were made: (1) the Commissioner erred in rejecting the opinions of her treating physicians; and (2) the Commissioner erred in rendering a residual functional capacity assessment that is not supported by the medical opinion of a treating or examining source and lacks an articulation of linkage to the medical evidence of record. Because these are related issues, the Court will address each issue in the context of its residual functional capacity analysis.

The Eleventh Circuit has made clear that "[r]esidual functional capacity, or RFC, is a medical assessment of what the claimant can do in a work setting despite any

---

[2] This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." *Peeler v. Astrue,* 400 Fed.Appx. 492, 493 n.2 (11th Cir. Oct. 15, 2010), citing 20 C.F.R. § 416.945(a). Stated somewhat differently, "[a] claimant's RFC is 'that which [the claimant] is still able to do despite the limitations caused by his . . . impairments.'" *Hanna v. Astrue,* 395 Fed.Appx. 634, 635 (11th Cir. Sept. 9, 2010), quoting *Phillips v. Barnhart,* 357 F.3d 1232, 1238 (11th Cir. 2004). "In making an RFC determination, the ALJ must consider all the record evidence, including evidence of non-severe impairments." *Hanna, supra* (citation omitted); *compare* 20 C.F.R. §§ 404.1545(a)(1) & 416.945(a)(1) (2011) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.") *with* 20 C.F.R. §§ 404.1545(a)(3) & 416.945(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence.").

From the foregoing, it is clear that the ALJ is responsible for determining a claimant's RFC, a deep-seated principle of Social Security law, 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level under § 404.929 or at the Appeals Council review level under § 404.967, the administrative law judge or the administrative appeals judge at the Appeals Council (when the Appeals Council makes a decision) is responsible for assessing your residual functional capacity."); *see also* 20 C.F.R. § 416.946(c) (same), that this Court has never taken issue with. *See, e.g., Hunington ex rel. Hunington v. Astrue,* No. CA 08-0688-WS-C, 2009 WL 2255065, at *4 (S.D. Ala. July 28, 2009) ("Residual functional capacity is a determination made by the ALJ[.]") (order adopting report and recommendation of the undersigned). The regulations provide, moreover, that while a claimant is "responsible for providing the evidence [the ALJ] . . . use[s] to make a[n] [RFC] finding[,]" the ALJ is responsible for developing the claimant's "complete medical history, including arranging for a consultative

examination(s) if necessary," and helping the claimant get medical reports from his own medical sources. 20 C.F.R. §§ 404.1545(a)(3) & 416.945(a)(3). In assessing RFC, the ALJ must consider any statements about what a claimant can still do "that have been provided by medical sources," as well as "descriptions and observations" of a claimant's limitations from his impairments, "including limitations that result from [] symptoms, such as pain[.]" *Id*.

In determining a claimant's RFC, the ALJ considers a claimant's "ability to meet the physical, mental, sensory, or other requirements of work, as described in paragraphs (b), (c), and (d) of this section." 20 C.F.R. §§ 404.1545(a)(4) & 416.945(a)(4).

> (b) *Physical abilities*. When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

> (c) *Mental abilities*. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

> (d) *Other abilities affected by impairment(s)*. Some medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions, may cause limitations and restrictions which affect other work-related abilities. If you have this type of impairment(s), we consider any resulting limitations and restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity.

20 C.F.R. §§ 404.1545(b), (c) & (d) and 416.945(b), (c) & (d).

Against this backdrop, this Court starts with the proposition that an ALJ's RFC determination necessarily must be supported by substantial evidence. *Compare Figgs v. Astrue,* 2011 WL 5357907, *1 & 2 (M.D. Fla. Oct. 19, 2011) ("Plaintiff argues that the ALJ's residual functional capacity ('RFC') determination is not supported by substantial evidence. . . . [The] ALJ's RFC Assessment is [s]upported by substantial record evidence[.]"), *report & recommendation approved,* 2011 WL 5358686 (M.D. Fla. Nov. 3, 2011) and *Scott v. Astrue,* 2011 WL 2469832, *5 (S.D. Ga. May 16, 2011) ("The ALJ's RFC Finding Is Supported by Substantial Evidence[.]"), *report & recommendation adopted,* 2011 WL 2461931 (S.D. Ga. Jun. 17, 2011) *with Green v. Social Security Administration,* 223 Fed.Appx. 915, 923 & 923-924 (11th Cir. May 2, 2007) (per curiam) ("Green argues that without Dr. Bryant's opinion, there is nothing in the record for the ALJ to base his RFC conclusion that she can perform light work. . . . Once the ALJ determined that no weight could be placed on Dr. Bryant's opinion of [] Green's limitations, the only documentary evidence that remained was the office visit records from Dr. Bryant and Dr. Ross that indicated that she was managing her respiration problems well, that she had controlled her hypertension, and that her pain could be treated with over-the-counter medication. Thus, substantial evidence supports the ALJ's determination that Green could perform light work."). And while, as explained in *Green, supra*, an ALJ's RFC assessment may be supported by substantial evidence even in the absence of an opinion by an examining medical source about a claimant's residual functional capacity, specifically because of the hearing officer's rejection of such opinion,[3] 223 Fed.Appx. at 923-924; *see also id.* at

---

[3] An ALJ's articulation of reasons for rejecting a treating source's RFC assessment must, of course, be supported by substantial evidence. *Gilabert v. Commissioner of Social Security,* 396 Fed.Appx. 652, 655 (11th Cir. Sept. 21, 2010) ("Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. In this case, therefore, the critical (Continued)

923 ("Although a claimant may provide a statement containing a physician's opinion of her remaining capabilities, the ALJ will evaluate such a statement in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ."), **nothing** in *Green* can be read as suggesting anything contrary to those courts— including this one—that have staked the position that the ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work.[4] *Compare, e.g.,*

---

question is whether substantial evidence supports the ALJ's articulated reasons for rejecting Thebaud's RFC.") (citing *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005)); *D'Andrea v. Commissioner of Social Security Admin.*, 389 Fed.Appx. 944, 947-948 (11th Cir. Jul. 28, 2010) (per curiam) (same).

[4]     In *Green, supra,* such linkage was easily identified since the documentary evidence remaining after the ALJ properly discredited the RFC opinion of the treating physician "was the office visit records from Dr. Bryant and Dr. Ross that indicated that [claimant] was managing her respiration problems well, that she had controlled her hypertension, and that her pain could be treated with over-the-counter medication." 223 Fed.Appx. at 923-924. Based upon such nominal clinical findings, the court in *Green* found "substantial evidence support[ing] the ALJ's determination that Green could perform light work." *Id.* at 924; *see also Hovey v. Astrue*, Civil Action No. 1:09CV486-SRW, 2010 WL 5093311, at *13 (M.D. Ala. Dec. 8, 2010) ("The Eleventh Circuit's analysis in *Green*, while not controlling, is persuasive, and the court finds plaintiff's argument . . . that the ALJ erred by making a residual functional capacity finding without an RFC assessment from a physician without merit. In formulating plaintiff's RFC in the present case, the ALJ—like the ALJ in *Green*—relied on the office treatment notes of plaintiff's medical providers.").

    Therefore, decisions, such as *Stephens v. Astrue*, No. CA 08-0163-C, 2008 WL 5233582 (S.D. Ala. Dec. 15, 2008), in which a matter is remanded to the Commissioner because the "ALJ's RFC determination [was not] supported by substantial and tangible evidence" still accurately reflect the view of this Court, but not to the extent that such decisions are interpreted to require that "substantial and tangible evidence" **must—in all cases—include** an RFC or PCE from a physician. *See id.* at *3 ("[H]aving rejected West's assessment, the ALJ **necessarily had to** point to a PCE which supported his fifth-step determination that Plaintiff can perform light work activity.") (emphasis added). But, because the record in *Stephens*

> contain[ed] no physical RFC assessment beyond that performed by a disability examiner, which is entitled to no weight whatsoever, there [was] simply no basis upon which this court [could] find that the ALJ's light work RFC determination [was] supported by substantial evidence. [That] record [did] not reveal evidence that would support an inference that Plaintiff [could] perform the requirements of light work, and certainly an ALJ's RFC determination must be supported by

(Continued)

*Saunders v. Astrue,* 2012 WL 997222, *5 (M.D. Ala. Mar. 23, 2012) ("It is unclear how the ALJ reached the conclusion that Plaintiff 'can lift and carry up to fifty pounds occasionally and twenty-five pounds frequently' and sit, stand and/or walk for six hours in an eight hour workday, [] when the record does not include an evaluation of Plaintiff's ability to perform work activities such as sitting, standing, walking, lifting, bending, or carrying.") *with* 20 C.F.R. §§ 404.1545(b), (c) & (d) and 416.945(b), (c) & (d); *see also Packer v. Astrue,* 2013 WL 593497, *4 (S.D. Ala. Feb. 14, 2013) ("[T]he ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work."), *aff'd,* 2013 WL 5788574 (11th Cir. Oct. 29, 2013).

Indeed, the Eleventh Circuit appears to agree that such linkage is necessary for federal courts to conduct a meaningful review of an ALJ's decision. For example, in *Hanna, supra,* the panel noted that

> [t]he ALJ determined that Hanna had the RFC to perform a full range of work at all exertional levels but that he was limited to 'occasional hand and finger movements, overhead reaching, and occasional gross and fine manipulation.' In making this determination, the ALJ relied, in part, on the testimony of the ME. . . .
>
> The ALJ's RFC assessment, as it was based on the ME's testimony, is problematic for many reasons. . . . [G]iven that the ME opined only that Hanna's manipulation limitations were task-based without specifying how often he could perform such tasks, it is unclear how the ALJ

---

substantial and tangible evidence, not mere speculation regarding what the evidence of record as a whole equates to in terms of physical abilities.

*Id.* (citing *Cole v. Barnhart*, 293 F. Supp.2d 1234, 1242 (D. Kan. 2003) ("The ALJ is responsible for making a RFC determination, and he must link his findings to substantial evidence in the record and explain his decision.")).

concluded that Hanna could occasionally engage in all forms of hand and finger movements, gross manipulation, and fine manipulation. . . .

The ALJ also agreed with the VE's testimony that, under the RFC determination, Hanna could return to his past work. **But this conclusion is not clear from the record.** The VE answered many hypothetical questions and initially interpreted the ME's assessment to mean that Hanna's gross manipulation abilities were unlimited and so, with only a restriction to fine manipulation, he could perform his past relevant work. In a separate hypothetical, the VE stated that a claimant could not return to his past work as a packaging supervisor if restricted to occasional fingering, handling, and gross and fine manipulation. The ALJ also did not include the ME's steadiness restriction in the RFC assessment; and the VE testified that a person restricted to handling that required steadiness would not be able to return to Hanna's past work.

**The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful review.** The ALJ has not done so here. To the extent the ALJ based Hanna's RFC assessment on hearing testimony by the ME and VE, the assessment is inconsistent with the evidence. The ALJ did not explicitly reject any of either the ME's or VE's testimony or otherwise explain these inconsistencies, the resolution of which was material to whether Hanna could perform his past relevant work. **Absent such explanation, it is unclear whether substantial evidence supported the ALJ's findings; and the decision does not provide a meaningful basis upon which we can review Hanna's case."**

395 Fed.Appx. at 635-636 (emphasis added and internal citations and footnotes omitted); *see also Ricks v. Astrue*, No. 3:10–cv–975–TEM, 2012 WL 1020428, at *9 (M.D. Fla. Mar. 27, 2012) ("'The existence of substantial evidence in the record favorable to the Commissioner may not insulate the ALJ's determination from remand when he or she does not provide a **sufficient rationale to link such evidence to the legal conclusions reached**.' Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow him to explain the basis for his decision.") (quoting *Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005)) (emphasis added); *cf. Keeton v. Department of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) ("The [Commissioner's] failure to apply the correct law or to provide

the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal.") (citation omitted).

Such linkage, moreover, may not be manufactured speculatively by the Commissioner—using "the record as a whole"—on appeal, but rather, must be clearly set forth in the ALJ's decision. *See, e.g., Durham v. Astrue*, Civil Action No. 3:08CV839-SRW, 2010 WL 3825617, at *3 (M.D. Ala. Sep. 24, 2010) (rejecting the Commissioner's request to affirm an ALJ's decision because, according to the Commissioner, overall, the decision was "adequately explained and supported by substantial evidence in the record"; holding that affirming that decision would require that the court "ignor[e] what the law requires of the ALJ[; t]he court 'must reverse [the ALJ's decision] when the ALJ has failed to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted'") (quoting *Hanna*, 395 Fed. Appx. at 636 (internal quotation marks omitted)); *see also id.* at *3 n.4 ("In his brief, the Commissioner sets forth the evidence on which the ALJ could have relied . . . . There may very well be ample reason, supported by the record, for [the ALJ's ultimate conclusion]. However, because the ALJ did not state his reasons, the court cannot evaluate them for substantial evidentiary support. Here, the court does not hold that the ALJ's ultimate conclusion is unsupportable on the present record; the court holds only that the ALJ did not conduct the analysis that the law requires him to conduct.").

In this case, as the undersigned considers the issues raised by plaintiff in this case, it will become apparent that the Commissioner linked her RFC assessment to specific evidence in the record bearing upon Busby's ability to perform the physical, mental, sensory and other requirements of work. The plaintiff's primary contention, of course, is that the ALJ erred in rejecting the opinions of her treating physicians. More specifically, plaintiff argues that the ALJ erred in rejecting the mental residual

functional capacity assessments rendered by her treating psychiatrists, Dr. Shao Hua Ye and Dr. Eugene Fletcher.

> The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause is shown when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. *Moore [v. Barnhart]*, 405 F.3d [1208,] 1212 [(11th Cir. 2005)].

*Gilabert, supra,* 396 Fed.Appx. at 655.

In this case, the ALJ accorded "little" weight or "no significant" weight to the mental residual functional capacity assessments completed by Drs. Ye and Fletcher. (Tr. 32.) This Court will not again set forth the ALJ's lengthy analysis of the opinion evidence offered by Drs. Ye and Fletcher. Instead, the Court simply observes that this portion of the ALJ's decision (*see* Tr. 32-33) certainly reflects an articulation of specific and adequate reasons, supported by substantial evidence, for rejecting the various opinions offered by plaintiff's treating psychiatrists. *See Gilabert, supra,* 396 Fed.Appx. at 655. In particular, this Court agrees with the ALJ that the "marked" and "extreme" limitations found by Drs. Ye and Fletcher are inconsistent with these psychiatrists' own treatment records. (Tr. 32 ("[Dr. Ye's] assessment of marked deficits in functioning is inconsistent with treatment notes, including findings that the claimant was mildly depressed, and that her concentration and attention are unimpaired. The GAF score assessed in March 2011 further support only moderate symptoms or limitations, contradicting Dr. Ye's March 2011 [mental RFC] assessment."); *see also id.* at 32-33 ("[As for Dr. Fletcher's mental RFC assessment,] [c]orresponding mental health treatment records regularly noted the claimant to have logical thoughts and unimpaired

concentration, from November 2010 through January 2012.").) The sole "positive" objective findings noted by plaintiff's treating psychiatrists from her application date of October 8, 2010 through 2012 consist of several notations of mild depression or "sad" mood and affect with mood swings (*see* Tr. 271, 274, 277, 348, 351, 353, 355, 358 & 375); however, on several occasions Busby's mood and affect were noted to be normal or appropriate (Tr. 345 & 372) and at no time did plaintiff's treating psychiatrists ever indicate that Busby had any impairments with respect to her behavior, speech, memory, concentration or thoughts (Tr. 271-272, 274-275, 277-278, 348-349, 351, 353, 355, 358-359, 372-373, 375-376, 385-386, 424 & 437-438). These relatively benign objective findings regarding plaintiff's psychiatric condition simply do not reasonably support the severe limitations contained in the mental RFC assessments completed by Drs. Ye and Fletcher (*compare id. with* Tr. 368-369 (Ye's RFC questionnaire) & Tr. 281-282 (Fletcher's RFC questionnaire)).[5] Given the correctness of the ALJ's determination that the objective examination findings made by plaintiff's treating psychiatrists do not support the limitations on functioning reflected in the two psychiatrists' mental RFC assessments, the ALJ did not err in according their opinions "little" or "no significant" weight.

In addition to disagreeing with the plaintiff's first assignment of error, the undersigned also cannot agree with plaintiff that the Commissioner failed to link her RFC assessment to specific evidence in the record bearing upon Busby's ability to perform the physical, mental, sensory and other requirements of work. While the

---

[5] The findings by Dr. Ye that Busby has "marked" deficiencies in concentration, persistence or pace, and by Dr. Fletcher that plaintiff has "extreme" deficiencies in concentration, persistence or pace, fly in the face of the contents of their treatment notes which consistently fail to mention any impairment associated with claimant's concentration. As well, there is simply no evidence of record establishing that plaintiff has had four or more episodes of decompensation in work or work-like situations as found by the treating psychiatrists.

undersigned agrees with plaintiff that the Commissioner's RFC assessment was not supported by the opinion of a treating or examining physician regarding her mental and physical functional limitations, this does not mean that the Court must necessarily find a lack of linkage between the Commissioner's RFC assessment and evidence in the record bearing upon Busby's ability to perform the mental and physical requirements of work which exists in significant numbers in the national economy. Indeed, substantial evidence of record supports the ALJ's determination that plaintiff retains the mental and physical residual functional capacity to perform less than the full range of light work. (*See* Tr. 25 ("**I find that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 416.967(b). The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently. The claimant has no restriction in the ability to sit, and standing/walking would be limited to 30 minutes at a time but could be done throughout the workday as long as there was a change in position every 30 minutes. The claimant can [do] no more than occasionally operate foot controls or climb ramps or stairs, but never ladders, ropes or scaffolds. The claimant can never crawl or kneel, and [is] unable to work around unprotected heights or dangerous equipment. The claimant must avoid tasks that involve a variety of instructions or tasks, but is able to understand and carry out simple one and two step instructions and detailed but uninvolved written or oral instructions involving a few concrete variables in or from standardized situations. The claimant must have minimal changes in the work setting and routines. The claimant must only be expected to make judgments on simple work related decisions. The claimant must avoid production-paced work such as work that is being pushed at them, but is able to perform goal-oriented work. The claimant must avoid crowds and can have no more than occasional superficial contact with the**

**public.**").) With respect to plaintiff's mental condition, the substantial evidence consists of the very benign objective findings recorded by plaintiff's treating psychiatrists (Tr. 271-272, 274-275, 277-278, 348-349, 351, 353, 355, 358-359, 372-373, 375-376, 385-386, 424 & 437-438), the January 20, 2011 psychiatric review technique form completed by non-examiner Dr. Donald E. Hinton (Tr. 247-260), Dr. Hinton's January 20, 2011 mental RFC assessment (Tr. 261-264), and the consultative mental examination of plaintiff by Dr. Annie Formwalt on January 13, 2011 (Tr. 244-245). *Cf. Green, supra,* 223 Fed.Appx. at 923-924.[6] As for plaintiff's physical condition, the Commissioner provides unquestioned linkage (Tr. 28 ("The objective evidence provides evidence that while her back and knee may cause limitations in functioning, they are not debilitating. Restrictions in the claimant's exertional capacity have been afforded, with particular restrictions in standing and walking in order to accommodate the combination of back and knee orthopedic issues, in combination with obesity. Restrictions in postural function were similarly provided, also contributing to restriction in working around dangerous equipment or unprotected heights. Despite her allegations of the daily need for a knee brace and occasional need to use a cane, she acknowledged at the hearing that these assistive devices were not prescribed. Furthermore, the evidence does not support the claimant's allegations regarding the persistent use of these devices, as they were not observed by treating sources to have been used with any regularity or the frequency

---

[6]　　　That there was linkage in this case—with respect to plaintiff's mental condition— is apparent. (*Compare, e.g.,* Tr. 33 ("Based on the combination of Dr. Fletcher's assessment and additional treatment, the claimant was afforded significant restrictions in the complexity of tasks and instructions, changes in the workplace, the pace of work performed, and exposure to crowds and the public. Therefore, moderate restrictions were provided in these areas in order to accommodate the claimant's condition.") *with id.* at 33-34 ("Despite the claimant's allegations, her longitudinal treatment history illustrates a mental condition that generally remains mildly limited, but even accommodating fluctuations and exacerbations, has not been more than moderately limited during the relevant period.").)

alleged, even in orthopedic treatment in August 2011. The restrictions provided accommodate the claimant's physical capacity to function as supported by clinical findings and observations made of her medical condition, as reflected in treatment and examination records." (internal citations omitted)), and her physical RFC assessment is support by substantial evidence of record (*see* Tr. 265-268, 313, 320, 337, 343, 399, 413 & 431).[7]

Because substantial evidence of record supports the Commissioner's determination that Busby can perform the physical and mental requirements of less than the full range of light, and plaintiff makes no argument that this residual functional capacity would preclude her performance of the jobs identified by the vocational expert ("VE") during the administrative hearing,[8] the Commissioner's fifth-

---

[7]    More specifically, the evidence of record supporting the "physical" portion of the Commissioner's RFC assessment (*see* Tr. 25) includes the objective examination findings by consultative examiner, Dr. Elmo Ozment (Tr. 266-268), consistent x-ray and CT scan evidence of mild degenerative changes of the lumbar spine (Tr. 313, 399 & 413), and evidence of record that the osteoarthritis in Busby's left knee (*see* Tr. 343) was treated first with ant-inflammatories and muscle relaxers (Tr. 337) and then, a year later, with an injection (Tr. 431). Significantly, no doctor who treated Busby's severe physical impairments—that is, her back and left knee impairments—indicated that those impairments result in more restrictive limitations than found by the Commissioner. Thus, the undersigned has no hesitancy in finding that the Commissioner's physical RFC limitations (*see* Tr. 25 (limiting the ability to stand and walk to 30 minutes at a time with the need to change positions every 30 minutes, noting an inability to climb ladders, ropes or scaffolds, noting an inability to crawl, kneel, work at unprotected heights, or work around dangerous equipment, and noting an ability to operate foot controls only occasionally)) are restrictive enough to account for plaintiff's back and left knee impairments.

[8]    The vocational expert specifically testified during the administrative hearing that the jobs he identified would allow the individual to change positions in the manner contemplated by the hypothetical question. (Tr. 77-78.)

> Q      Now I know that the DOT does not identify, it says standing and walking two hours at a time. In the hypothetical situation we're dealing with here, it was 30 minutes and then needed to change position a little bit, so that's a little different than what is contemplated by the DOT. Is there an explanation that you understand about these jobs?

(Continued)

step determination is due to be affirmed. *See, e.g., Owens v. Commissioner of Social Security,* 508 Fed.Appx. 881, 883 (11th Cir. Jan. 28, 2013) ("The final step asks whether there are significant jobs in the national economy that the claimant can perform, given h[er] RFC, age, education, and work experience. The Commissioner bears the burden at step five to show the existence of such jobs . . . [and one] avenue[] by which the ALJ may determine [that] a claimant has the ability to adjust to other work in the national economy . . . [is] by the use of a VE.") (internal citations omitted); *Land v. Commissioner of Social Security,* 494 Fed.Appx. 47, 50 (11th Cir. Oct. 26, 2012) ("At step five . . . 'the burden shifts to the Commissioner to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.' The ALJ may rely solely on the testimony of a VE to meet this burden.") (internal citations omitted).

## <u>CONCLUSION</u>

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 25th day of November, 2013.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

---

A       Yes ma'am. I gave you jobs that I have seen performed such that the individual could meet the hypothetical.

Q       So, you've observed these jobs and you know?

A       I have.

(*Id.*)